# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KRISTEN ENGLE** | :   **CIVIL ACTION** |
| | : |
| | : |
| **v.** | : |
| | :   **NO. 14-1192** |
| **PHYSICIAN LANDING ZONE** | : |
| | : |

**KEARNEY, J.**                                                                                           **March 14, 2017**

## MEMORANDUM

A health care provider deciding when one of its contracted surgeons may return to her surgery duties after a short-term disability based upon an independent medical examination showing the surgeon suffered from recent onset of post-traumatic stress disorder may justifiably rely upon the independent medical examination in delaying her return until the provider receives a later independent examination removing the disability concern. The employee surgeon's word, or the summary word of her long-time doctor, does not necessarily override the independent medical examiner's finding. Upon receiving an independent contrary finding, the employer may allow the surgeon to return to her duties. When the employer later opts out of the automatic renewal of the surgeon's contract or not rehire her at a lower salary or with different terms, the employee surgeon may proceed to trial on disability discrimination and retaliation if she adduces sufficient evidence challenging the employer's stated legitimate financial reasons for this employment decision. In the accompanying Order, we grant the employer's motion for summary judgment and dismiss the employee surgeon's discrimination and retaliation claims arising from a delayed return from short term disability but deny the motion as to whether the employer's decision not to rehire the surgeon is pretext for disability discrimination or retaliation.

## I.    Undisputed material facts.[1]

Dr. Kirsten Engle is a general surgeon.[2]  On November 5, 2012, Dr. Engle began her two-year contractual term of employment with Physician Landing Zone, a physician practice plan established by Highmark, Inc.[3]  Her employment contract automatically renewed unless Physician Landing Zone decided in writing to not automatically renew.  Dr. Engle worked, at least initially, at West Penn Hospital.[4]  As a general surgeon at West Penn Hospital, Dr. Engle worked every day of the week seeing patients, taking calls, interacting with residents, doing consultations, and performing surgery.[5]

### A.  A car accident results in serious injuries for Dr. Engle's 8 year old son.

In April 2013, Dr. Engle's eight-year-old son sustained life-threatening injuries—including a skull fracture—when a car struck him.[6]  The incident admittedly overwhelmed Dr. Engle, and she struggled with her ability to cope with the situation.[7]  Soon after the incident, Dr. Engle stopped working.[8]  In mid-May 2013, she applied for short-term disability leave.[9]

Dr. Bernard Grumet served as Dr. Engle's primary care physician.[10]  Dr. Grumet supported Dr. Engle's application for short-term disability leave.[11]  Highmark granted her short-term disability benefits from May 13, 2013 through August 9, 2013.[12]

### B.  An IME finds Dr. Engle disabled.

In July 2013, Dr. Michael Mihok—a medical consultant handling Highmark's leave management issues—recommended Dr. Engle undergo an independent medical examination (IME).[13]  Dr. Mihok recommended the IME for the purpose of determining Dr. Engle's short-term disability status, and the IME psychiatrist—Dr. Lawson Bernstein—understood this to be his sole responsibility.[14]

On August 9, 2013, Dr. Engle saw Dr. Bernstein.[15] Later in August 2013, Dr. Bernstein submitted a written report concluding Dr. Engle suffered from post-traumatic stress disorder due to her son's life-threatening injuries.[16] He found this diagnosis "obvious."[17] Based on this diagnosis, Dr. Bernstein found Dr. Engle disabled.[18]

Although Dr. Bernstein's sole purpose for conducting the IME consisted of determining her eligibility for short-term disability, Dr. Bernstein also made findings regarding Dr. Engle's fitness for duty and current treatment regime.[19] Dr. Bernstein explained Dr. Engle's medical condition rendered her "unsafe to operate due to the adverse effects" of her symptoms on her "attention and concentration."[20] He found Dr. Engle experienced "notable psychomotor agitation," which "appeared to be unconscious and real."[21] Dr. Bernstein opined Dr. Engle's "nightmares, flashbacks, and recurrent intrusive thoughts of the accident likely would make it impossible for her to tolerate an OR or hospital practice setting."[22] Dr. Bernstein also concluded Dr. Engle's "current treatment regime is wholly inadequate" and found it "imperative that [Dr. Engle] be managed locally by a psychiatrist with specific expertise in the management of complicated post-traumatic stress disorder."[23] He predicted Dr. Engle could return to work within six to twelve months.[24] Dr. Mihok, upon receiving Dr. Bernstein's report, recommended extending Dr. Engle's disability leave.[25]

### C. Based on Dr. Bernstein's opinion, Physician Landing Zone delays Dr. Engle's return to work.

In late August 2013, Dr. Engle asked Marilyn Blaine of Highmark's Leave Management what she needed to do to return to work.[26] Ms. Blaine told Dr. Engle she needed to seek clearance from her long-time psychiatrist, Thomas Lewis, M.D., as long as Dr. Engle saw Dr. Lewis in California, where he is licensed.[27]

In September 2013, Dr. Engle, at her own expense, flew to meet with Dr. Lewis in California.[28]  On September 16, 2013, Dr. Lewis had an appointment with Dr. Engle.[29]  Dr. Lewis fully released Dr. Engle to work as a surgeon as he believed with a reasonable degree of medical certainty she could capably and competently perform her job.[30]  Dr. Lewis filled out a return to work checklist Highmark sent to him, and he returned it to Highmark.[31]  Dr. Lewis also provided Physician Landing Zone with Dr. Engle's work release.[32]

On October 23, 2013, Marie Hare—Highmark's Manager of Employee Corporate Health Services in Leave Management[33]—told Dr. Engle, "objective medical information received to date does not provide evidence to support that you are able to safely return to your duties as a surgeon."[34]  Ms. Hare told Dr. Engle, "[Y]our company has been advised you are not authorized to return to work and will remain on paid STD leave through November 17th, 2013 at which time your STD benefits will exhaust and your claim will be submitted for Long-Term Disability consideration."[35]  Ms. Hare based her decision on Dr. Bernstein's August 9, 2013 IME and "the lack of any subsequent medical evidence to support that you received adequate treatment for your condition."[36]  Ms. Hare informed Dr. Engle of her right to appeal by November 7, 2013, and provide all medical information she wished to have considered.[37]

On November 3, 2013, Dr. Lewis responded to Ms. Blaine's refusing to allow Dr. Engle to work.[38]  Dr. Lewis stated he treated Dr. Engle for sixteen years and has seen or spoken with her weekly during that time period.[39]  Dr. Lewis explained, "While it is true that she had some acute emotional upset in the wake of her son's near-lethal accident, she has coped well with that stressful event and has been fully recovered for some time now."[40]  Dr. Lewis concluded Dr. Engle "is not disabled, and she is fully competent to resume her former duties as a surgeon."[41]

Although Dr. Lewis offered to provide additional information Ms. Blaine required,[42] Ms. Blaine did not ask Dr. Lewis for further information.[43]

Dr. Mihok, instead of contacting Dr. Lewis and requesting more information from him, requested more information from Dr. Bernstein.[44] On November 15, 2013, Dr. Mihok provided Dr. Bernstein the mental abilities checklist completed by Dr. Lewis as well as Dr. Lewis' letter clearing Dr. Engle for work.[45] Dr. Mihok asked Dr. Bernstein to review the materials and state whether the materials changed his earlier opinions concerning Dr. Engle's IME.[46]

On November 19, 2013, Dr. Bernstein responded to Dr. Mihok's request[47] concluding Dr. Lewis's findings were "underwhelming" and "uncompelling," in part due to the lack of treatment records identifying "specifically what was done to remit Ms. Engle's PTSD symptomology."[48] Dr. Bernstein continued to insist Dr. Engle suffered from PTSD and required evidence-based treatment.[49] Dr. Bernstein also expressed concern with Dr. Engle's dosage of benzodiazepine klonopin, suggesting they contribute to "significant sleep disturbance."[50]

In December 2013, Dr. Engle spoke with Ms. Hare about Dr. Bernstein's decision.[51] Ms. Hare told Dr. Engle she had "no mechanism" to return Dr. Engle to West Penn Hospital in light of Dr. Bernstein's IME finding.[52]

On December 30, 2013, Dr. Engle emailed Kelley Benson—Highmark's Manager of Employee Relations—in which she relayed her conversation with Ms. Hare.[53] Dr. Engle asked whether Physician Landing Zone had terminated her in light of Ms. Hare's finding "no mechanism" exists to return Dr. Engle to West Penn Hospital.[54]

In response, Ms. Benson told Dr. Engle she had not been terminated.[55] Although Ms. Benson claimed Dr. Bernstein had requested Dr. Lewis's treatment notes for review on multiple occasions and the information had not been provided,[56] Dr. Engle swears no one asked her to

provide Dr. Lewis's treatment notes.[57] Dr. Lewis offered to provide information, but no one asked him to provide treatment notes.[58] Ms. Benson told Dr. Engle she either needed to participate in Dr. Bernstein's recommended treatment plan or have Dr. Lewis submit his treatment notes by January 16, 2014.[59]

On January 14, 2014, Dr. Engle told Ms. Benson her internist also deemed her fit to return to work.[60] Dr. Engle questioned what treatment she required given Dr. Lewis' conclusion she did not need additional treatment and she did not know what treatment Dr. Bernstein recommended: "The letter from [Ms. Hare] dated 8/30/2013, asked me to find a psychiatrist to treat me and notify Marilyn Blaine. I did. She approved my trip to be seen by Dr. Lewis. He evaluated me and deemed I needed no further treatment. . . . What treatment should I receive?"[61]

On January 26, 2014, Dr. Engle spoke with Ms. Hare by telephone.[62] Dr. Engle told Ms. Hare about Ms. Blaine allowing her to get Dr. Lewis to clear her for work.[63] Dr. Engle questioned why she needed further treatment for a disorder she no longer had.[64] Ms. Hare insisted Dr. Engle provide a record of treatment for PTSD.[65] Dr. Engle explained she did not believe she ever had PTSD, rather she suffered from the stress of the incident, and even if she did have PTSD it has resolved.[66] Ms. Hare then said Dr. Bernstein had concerns about the high medication doses, which Dr. Lewis did not address.[67] Dr. Engle responded no one asked Dr. Lewis to address the medication issue, and regardless, she had been taking this medication since the date of her hire.[68] Dr. Engle told Ms. Hare she disclosed her medication and dosage at the time of her hire.[69] Ms. Hare asked Dr. Engle if she would be willing to see Dr. Bernstein again, to which Dr. Engle answered, "no" because she did not like him and she believed he would want to protect his earlier diagnosis.[70] Ms. Hare also stated Dr. Lewis was biased because Dr. Lewis had treated Dr. Engle for so long.[71]

6

On January 30, 2014, Dr. Engle wrote Ms. Benson questioning why Dr. Bernstein has been involved in the determination of Dr. Engle's fitness to return to work when his responsibility only consisted of determining whether Dr. Engle qualified for short-term disability leave.[72] Dr. Engle again questioned why Dr. Bernstein's IME trumped Dr. Lewis's opinion when she had received permission to have Dr. Lewis clear her for work after Dr. Bernstein's IME.[73]

Despite these objections, Dr. Engle agreed to see a neutral third-party psychiatrist to resolve the issue.[74]

### D. A third-party psychiatrist clears Dr. Engle for work.

In early 2014, Dr. Engle met with Dr. Christine Martone—a third-party psychiatrist—for an IME.[75] On February 18, 2014, Dr. Martone found Dr. Engle had no psychiatric problems precluding her from safely performing surgery or interacting with patients.[76] Dr. Martone concluded Dr. Engle did not pose a risk for disruptive behaviors, verbal outbursts, or serious interpersonal difficulties in the workplace.[77] Dr. Martone also concluded although Dr. Engle's dosage of Klonopin is high, she has functioned "quite well" with this dosage for many years.[78] Dr. Martone released Dr. Engle to full duty without accommodation.[79]

Dr. Martone also found Dr. Bernstein and Dr. Grumet's PTSD diagnoses inaccurate because Dr. Engle had not been the victim of the accident and did not witness the accident.[80] Dr. Martone opined the appropriate diagnosis most likely constituted an exacerbation of Dr. Engle's pervious mood disorder or "possibly a superimposed adjustment disorder with mood or anxiety disturbances."[81] Because Dr. Engle lacked PTSD, Dr. Martone believed Dr. Bernstein's recommended course of treatment—including cognitive behavioral therapy—would be

inappropriate.[82] Dr. Martone suggested Dr. Engle continue her current course of treatment with Dr. Lewis.[83]

On February 19, 2014, the day after Physician Landing Zone received Dr. Martone's report, Physician Landing Zone authorized Dr. Engle to return to work and placed her back on the payroll.[84]

In mid-April 2014, Dr. Engle returned to active duty as a general surgeon at West Penn Hospital.[85] When Dr. Engle returned to work, Physician Landing Zone did not provide her the same advertising or signage other general surgeons received.[86] For example, Physician Landing Zone gave a new general surgeon, Dr. Jason Tomsic, business cards and an advertising brochure, but did not provide the same to Dr. Engle.[87] Instead, Physician Landing Zone placed Dr. Engle in an office with a colorectal surgeon, away from the other general surgeons.[88]

### E. Physician Landing Zone timely notifies Dr. Engle of its intent to not renew her employment contract.

Dr. Engle and Physician Landing Zone's two year employment agreement ended on November 4, 2014.[89] The agreement required Physician Landing Zone provide written notice of intent to not renew the agreement at least 120 days before ending the agreement or it would automatically renew for another year.[90]

On June 25, 2014, Dr. Howard Edington—Chairman of Surgery for Allegheny Health Network[91]—and Dr. Tony Farah—Chief Medical Officer of Allegheny Health Network— informed Dr. Engle of their intent to not renew her two year employment contract.[92] They stated, however, "We are very interested in our continued relationship but would like the opportunity to review our contract terms and make adjustments as appropriate."[93] They told Dr. Engle they would reach out to Dr. Engle to schedule a meeting to explore options.[94]

**F. Dr. Engle files this lawsuit.**

On September 4, 2014, Dr. Engle sued Highmark (doing business as Physician Landing Zone).[95] Dr. Engle later amended her Complaint in December 2014 and September 2015, adding claims and changing the named defendant to Physician Landing Zone.[96]

**G. The parties' post-lawsuit meetings to explore employment options.**

**1. September 26, 2014 meeting.**

On September 26, 2014, Dr. Engle met with Dr. Edington and Suzie Mercadante, the Service Line Vice President for the Allegheny Clinic.[97] During the meeting, Dr. Edington told Dr. Engle her relative value units (RVUs) were not high enough to pay for her salary[98] and her current salary was too high based on her productivity.[99]

It is unclear whether Physician Landing Zone considered the appropriate time period when determining Dr. Engle's productivity. At his deposition, Dr. Edington initially claimed the company determined Dr. Engle's anticipated productivity level by looking at her billing and RVUs *before* her disability leave.[100] Dr. Edington later stated they looked at all the times Dr. Engle had been "actively working."[101] Dr. Engle claims Dr. Edington told her they considered their financial investment in her over the entire course of her employment.[102] Dr. Engle recalls Dr. Edington saying the company had "employed me for two years, spent pushing three-quarters of a million dollars, including my salary, on setting up my practice, and that my RVUs were not high enough . . . . That the RVUs didn't pay for my salary."[103]

In response to Dr. Edington's claims about her productivity level, Dr. Engle told Dr. Edington she did not believe he calculated her RVUs appropriately.[104] She prepared a binder containing RVUs she knew had not been billed or counted in her favor from the date of her hire to the date of her leave.[105] Dr. Engle told Dr. Edington they failed to consider her RVUs from

9

her work in Connellsville.[106] Dr. Engle also said she had been useful in other ways for which she did not typically get RVUs by, among other things, training another physician and helping Dr. Tomsic in the operating room.[107]

Dr. Edington responded he was not interested in Dr. Engle's binder and he knew they had not billed for the charts and documentation in the binder.[108] Ms. Mercadante stated she would get the Connellsville RVUs information.[109] It is unclear whether she did. Ms. Mercadante offered to provide Dr. Engle with a graph or pie chart outlining her RVUs, and she provided Dr. Engle with a document later the same week which covered RVUs from January 2014 through June 2014.[110]

The parties dispute whether Dr. Engle refused to discuss a salary reduction. Dr. Engle testified the parties never discussed working with a salary reduction.[111] Dr. Edington claims they discussed a salary reduction.[112] Dr. Edington did not prepare a new contract, and he admits they did not discuss potential terms of a new contract.[113] Similarly, Ms. Mercadante recalls Dr. Edington said something to Dr. Engle about her having the ability to stay with a pay cut, but Ms. Mercadante does not recall Dr. Engle being willing to take a pay cut.[114]

During the same September 26, 2014 meeting, Dr. Edington mentioned the possibility of Dr. Engle working at other places.[115] According to Dr. Edington and Ms. Mercadante, they discussed opportunities in which Dr. Engle would work at these other places through Physician Landing Zone.[116] Dr. Engle counters these were positions she would have to pursue independently, not as an employee of Physician Landing Zone.[117]

Dr. Engle told Dr. Edington she thought she was being let go in retaliation for filing a lawsuit against Allegheny Health Network.[118] In response, Dr. Edington said he did not want to talk about the lawsuit.[119]

### 2. The October 11, 2014 meeting.

On October 11, 2014, Dr. Engle met with Dr. Edington and Belinda Koontz—an administrative worker—at Dr. Edington's Allegheny General office.[120] During the meeting, Dr. Edington told Dr. Engle she could "explore" working on a more regular basis with Highlands Hospital in Connellsville, but he did not tell her an opportunity existed.[121] Dr. Edington presented this opportunity not as a job offer, but as something Dr. Engle would need to pursue independently.[122] They did not discuss the option of Dr. Engle continuing to work with Physician Landing Zone with a salary reduction.[123]

### H. Physician Landing Zone discovers Dr. Engle retained confidential patient records.

During this litigation, Dr. Engle produced a thumb drive containing confidential and sensitive patient medical information for 143 individuals, including patients of Physician Landing Zone.[124] The parties dispute whether Physician Landing Zone authorized Dr. Engle to retain these records.[125]

## II. Analysis

Dr. Engle sued Physician Landing Zone for disability discrimination and retaliation under the Americans with Disabilities Act of 1990[126] and the Pennsylvania Human Relations Act ("PHRA").[127] Physician Landing Zone counterclaimed for breach of the employment contract and conversion..[128] Physician Landing Zone now moves for summary judgment on all of Dr. Engle's claims.[129] In the accompanying Order, we grant in part and deny in part Physician Landing Zone's motion.

## A. Dr. Engle's claims based on disability discrimination under the ADA and PHRA.[130]

Dr. Engle argues two bases for disability discrimination. She argues Physician Landing Zone discriminated against her on the basis of disability by: (1) refusing to allow her to return to work until after February 2014; and, (2) declining to automatically renew her two year contract.

### 1. We grant summary judgment as to Dr. Engle's disability discrimination claim based on Physician Landing Zone's failure to return her to work.

Physician Landing Zone argues Dr. Engle fails to establish a *prima facie* case for disability discrimination because she posed a direct threat to the health or safety of others. Physician Landing Zone also argues Dr. Engle failed to prove its proffered reasons for precluding Dr. Engle's earlier return to work were a pretext for disability discrimination. Because we find Physician Landing Zone demonstrates Dr. Engle posed a direct threat to patient safety based on a fulsome independent medical examination, we do not address whether Dr. Engle establishes pretext.

To establish a *prima facie* case of ADA discrimination, Dr. Engle must show she: (1) is disabled; (2) qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) has suffered an otherwise adverse employment decision as a result of discrimination.[131] Physician Landing Zone disputes the second element, arguing Dr. Engle was not qualified because she could not perform the essential functions of her job without endangering the health or safety of others, *i.e.* Dr. Engle posed a "direct threat" to the health and safety of others.

Under the ADA, the term "direct threat" appears in a section entitled "Defenses."[132] In this section, it is "a defense . . . that an alleged application of *qualification standards* . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a

disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation . . . ."[133]   The term "qualification standards" includes "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."[134]

The existence of a direct threat is an affirmative defense to be proved by the employer.[135] The relevant regulations define "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."[136]   An employer must base this determination on an "individualized assessment of the individual's present ability to safely perform the essential functions of the job."[137]   The assessment must "be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."[138]   When determining whether an individual poses a direct threat to the health or safety of others, the factors to be considered include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm."[139]   "[B]ecause few, if any, activities in life are risk free . . . the ADA does not ask whether a risk exists, but whether it is significant."[140]   "[C]ourts and entities deciding whether to exclude the disabled must rely on evidence that 'assesses the level of risk' for the 'question under the statute is one of statistical likelihood.'"[141]

An employer is not obligated to give weight to an employee's treating physician when determining an employee's disability status.[142]   For example, in *Coleman v. Pennsylvania State Police*, the Pennsylvania State Police's doctor determined officer Coleman could not return to full duty because he had not been free of seizures for five consecutive years, a policy created by the doctor.[143]   The doctor required five years free of seizures because the relevant statistics

demonstrated a person who suffered two seizures is 75 to 90 percent likely to suffer a third within a five-year period.[144]  After the Pennsylvania State Police sent Coleman a termination letter, Coleman provided documentation from his treating physician releasing him to work because the risk of seizure was, at best, three percent.[145]  The Pennsylvania State Police doctor reviewed the treating physician's work clearance documentation but maintained his conclusion Coleman could not return to full duty.[146]  Our Court of Appeals held the Pennsylvania State Police "adequately explained that the threat of a seizure is significant enough to constitute a 'direct threat' and that the [seizure policy] is a justified response to that threat."[147]  Coleman argued his doctor's opinion about the likelihood of a seizure contradicted the Pennsylvania State Police's doctor's opinion on the likelihood of a recurring seizure.[148]  Our Court of Appeals held, "[u]nfortunately for Coleman, there is no law to bar [employer] from trusting its own physician's assessment of risk over that provided by Coleman's treating physician."[149]

Similarly, in *Haas v. Wyoming Valley Health Care System*, the defendant argued the plaintiff surgeon—who suffered from bipolar disorder—posed a direct threat to the safety of patients.[150]  During the trial, the defendant presented testimony about an incident in which the plaintiff had a psychotic episode during an operation.[151]  During the episode, the plaintiff "became confused, and required significant assistance to complete a total knee replacement."[152]  The episode did not result in any harm to anyone, but it raised concerns among staff about patient safety.[153]  The jury returned a verdict in the plaintiff's favor.[154]  Judge Caputo, however, overturned the verdict, finding the defendant entitled to judgment as a matter of law because no reasonable juror could find the plaintiff did not pose a direct threat to patient safety.[155]  The judge did so even though the plaintiff presented two letters from psychiatrists purporting to

demonstrate the plaintiff's ability to work.[156] The judge noted the defendant's doctor reviewed the letters and found them "unconvincing."[157]

We now also face competing medical positions presented to the employer. On balance, Physician Landing Zone meets its burden of demonstrating a direct threat. After conducting an IME, Dr. Bernstein concluded in August 2013 Dr. Engle was disabled and could not perform the work of a surgeon in part due to safety concerns: "With her PTSD symptomatology as well as the other associated phenomena noted above, she is unsafe to operate due to the adverse effects these would have on attention and concentration."[158] He found Dr. Engle experienced "notable psychomotor agitation," which "appeared to be unconscious and real."[159] Dr. Bernstein found Dr. Engle's "nightmares, flashbacks, and recurrent intrusive thoughts of the accident likely would make it impossible for her to tolerate an OR or hospital practice setting."[160] Following Dr. Bernstein's IME, Dr. Engle provided documentation from her treating psychiatrist clearing her for work and finding no disability. After reviewing this information, Dr. Bernstein maintained his opinion, based in part on the conclusory nature of the work clearance and the lack of treatment records demonstrating steps taken to remit Dr. Engle's symptoms. More than six months after Dr. Bernstein's IME, Dr. Martone concluded Dr. Engle did not suffer from PTSD.

Applying the direct threat factors, Dr. Bernstein's findings demonstrate Dr. Engle posed a risk which would last throughout a surgical operation. As Dr. Engle concedes, the severity of the potential harm here is great, as a patient could be harmed if Dr. Engle's purported deficits affected her ability to operate safely. In finding Dr. Engle unsafe to operate due to her symptoms, Dr. Bernstein implicitly found the likelihood of potential harm to be great and imminent.

15

Physician Landing Zone relied on Dr. Bernstein's reasonable medical judgment, and it was not obligated to give more weight to the opinion of Dr. Engle's treating psychiatrist.[161] Dr. Bernstein rendered his opinions upon reviewing Dr. Engle's available medical records and conducting an in-person physical examination. For the purposes of the direct threat analysis, it is not our role to second guess an employer's reasonable medical judgment based on the best available objective evidence.

We grant summary judgment as to Dr. Engle's claim Physician Landing Zone discriminated against her on the basis of disability by refusing to allow her to return to work because Physician Landing Zone demonstrated Dr. Engle posed a direct threat to patient safety until it resolved her ability to return to surgery.

### 2. We deny summary judgment as to Dr. Engle's disability discrimination claim based on Physician Landing Zone's decisions to not renew her contract and to not rehire her.

Physician Landing Zone argues Dr. Engle cannot demonstrate its legitimate financial reasons for electing not to renew her two year employment contract upon her return to work were pretext for disability discrimination or retaliation. As we find several issues of material fact, we disagree and will allow the jury to evaluate the stated reasons for not automatically renewing the employment agreement.

Dr. Engle may use the *McDonnell Douglas*[162] burden-shifting scheme in overcoming a motion for summary judgment on her disability discrimination claims.[163] After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision.[164] The burden then shifts back to the plaintiff to (1) discredit "the proffered reasons for termination, directly or circumstantially," or (2) adduce "evidence that discrimination was more likely than not a motivating or

determinative cause of the adverse action."[165]  To discredit Physician Landing Zone's proffered reasons, Dr. Engle must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"[166]

As its legitimate, nondiscriminatory reason, Physician Landing Zone states it did not want to automatically renew Dr. Engle's contract because her productivity did not justify her compensation.[167]  Physician Landing Zone also contends the parties discussed the possibility of a contract but did not get to the point of discussing specific terms.[168]

Dr. Engle demonstrates sufficient evidence allowing a jury to discredit Physician Landing Zone's proffered reasons.  Although Physician Landing Zone claimed a shortfall in Dr. Engle's productivity, there is a genuine dispute of material fact over whether Physician Landing Zone considered all of the materials demonstrating Dr. Engle's productivity.  During Dr. Engle's meeting with Dr. Edington and Ms. Mercadante, Dr. Engle offered to provide them a binder of unbilled RVUs.  In response, Dr. Edington said he was not interested in Dr. Engle's binder and he knew they had not billed for the charts and documentation in the binder.[169]  This raises a genuine issue of material fact over whether Physician Landing Zone based its decisions on Dr. Engle's productivity.

There is also a genuine dispute of material fact over whether the parties discussed a salary reduction.  Dr. Edington claims the parties discussed a new contract with a salary reduction.[170]  Dr. Engle, however, claims they did not discuss whether she could continue working with a salary reduction.[171]  This inconsistency raises a genuine issue of fact for trial. We deny summary judgment as to Dr. Engle's discrimination claim based on Physician Landing

Zone's decision to not automatically renew the employment contract or rehire her after they recently disputed her disability with her.

## B. Dr. Engle's retaliation claims.

Dr. Engle argues Physician Landing Zone retaliated against her by: (1) refusing to allow her to return to work; and, (2) not renewing her contract.

### 1. We grant summary judgment as to Dr. Engle's claim Physician Landing Zone retaliated against her for refusing to allow her to return to work as a surgeon.

To establish a *prima facie* case of retaliation, Dr. Engle must demonstrate: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[172]

Physician Landing Zone argues Dr. Engle cannot demonstrate a causal connection between protected activity and its decision to refuse to permit Dr. Engle to return to work. Relatedly, Physician Landing Zone argues Dr. Engle cannot demonstrate its decision to refuse to permit Dr. Engle to return to work constituted pretext.

We need not address whether Dr. Engle demonstrates a causal connection because she fails to demonstrate Physician Landing Zone's decision to refuse to permit Dr. Engle to return to work is pretextual. As explained above, Physician Landing Zone satisfied its burden of demonstrating Dr. Engle posed a direct threat to the safety of patients. Under the ADA, the direct threat defense is "a defense to a charge of discrimination under this chapter," which necessarily includes a charge of discrimination alleging retaliation under 42 U.S.C. § 12203(a), which falls under the same chapter.[173] Because Physician Landing Zone's demonstrates Dr. Engle posed a direct threat to patient safety, we must grant summary judgment on this claim.

18

## 2. We deny summary judgment as to Dr. Engle's retaliation claim based on Physician Landing Zone's decisions to not renew her contract.

We deny summary judgment as to Dr. Engle's retaliation claim based on Physician Landing Zone's decisions to not renew her contract and to not rehire her. Physician Landing Zone's sole argument is Dr. Engle cannot demonstrate its reasons are pretextual. We reject this argument for the same reasons addressed above including finding a genuine dispute of material fact as to whether: (1) Physician Landing Zone considered all relevant information regarding Dr. Engle's productivity; and (2) the parties discussed a new contract with a salary reduction.

## C. Physician Landing Zone is not entitled to summary judgment on liability based on alleged after-acquired evidence of retaining patient information.

Physician Landing Zone argues it discovered Dr. Engle retained confidential patient records, and had it known it would have fired Dr. Engle. Physician Landing Zone makes this argument as a defense to its liability for disability discrimination and retaliation.[174]

After-acquired evidence of employee wrongdoing, however, is not a defense to liability.[175] After-acquired evidence operates "to limit the remedies available to a plaintiff where the employer can 'first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'"[176] As Physician Landing Zone does not argue the evidence discovered operates to limit Dr. Engle's remedies, but instead argues this evidence serves as a defense to its liability, we reject its argument.

### III.    Conclusion

In the accompanying Order, we grant Physician Landing Zone's motion for summary judgment only as to Dr. Engle's claims Physician Landing Zone discriminated and retaliated

against her by refusing to allow her to return to work from short-term disability leave. We deny its motion in all other respects.

---

[1] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Dr. Engle, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. Physician Landing Zone filed its Statement of Undisputed Material Facts at ECF Doc. No. 59. Physician Landing Zone filed an appendix at ECF Doc. Nos. 61 through 61-17. Dr. Engle responded to the City's Statement of Undisputed Material Facts at ECF Doc. No. 63. Dr. Engle added documents to the Appendix at ECF Doc. Nos. 65 through 65-3. Dr. Engle provided a concise statement of material facts at ECF Doc. No. 64. Physician Landing Zone responded to Dr. Engle's concise statement of material facts at ECF Doc. No. 67. References to the exhibits in the appendices shall be referred to by bates number, for example, "Appx. 1."

[2] ECF Doc. No. 63, ¶ 5.

[3] *Id.* ¶¶ 1–2. As of January 1, 2014, Physician Landing Zone amalgamated into Allegheny Health Network. ECF Doc. No. 63, ¶ 52. According to a joint motion filed early on in this case, as of January 1, 2014, Physician Landing Zone is a non-profit company whose sole member is Allegheny Clinic, a subsidiary of West Penn Allegheny Health System, Inc. ECF Doc. No. 6, ¶ 2.

[4] ECF Doc. No. 63, ¶ 4.

[5] *Id.* ¶ 5.

[6] Appx. 55, 140.

[7] Appx. 8–10.

[8] ECF Doc. No. 63, ¶ 7.

[9] *Id.* ¶ 8.

[10] *Id.* ¶ 9.

[11] *Id.* ¶ 9.

[12] *Id.* ¶ 11.

[13] *Id.* ¶ 12.

[14] Appx. 205–06, 214–16.

[15] ECF Doc. No. 63, ¶ 19.

[16] *Id.* ¶ 21.

[17] *Id.*

[18] *Id.* ¶ 23.

[19] Appx. 214–16; ECF Doc. No. 63, ¶ 22–23.

[20] ECF Doc. No. 63, ¶ 23.

[21] Appx. 82.

[22] ECF Doc. No. 63, ¶ 23.

[23] *Id.* ¶ 22.

[24] *Id.* ¶ 23.

[25] *Id.* ¶ 24.

[26] Appx. 325.

[27] *Id.*

[28] *Id.*

[29] Appx. 323.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] ECF Doc. No. 63, ¶ 15 n.5.

[34] Appx. 132.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] Appx. 133.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Appx. 324.

[44] Appx. 103.

[45] Appx. 85.

[46] *Id.*

[47] Appx. 86.

[48] Appx. 86–87.

[49] Appx. 87.

[50] Appx. 86.

[51] Appx. 326.

[52] *Id.* Dr. Engle argues Physician Landing Zone, in responses to multiple sets of Interrogatories, changed who it claimed to be the final decisionmaker regarding the decision to refuse to let Dr. Engle return to work. *See* ECF Doc. No. 67, ¶¶ 198–253. In Physician Landing Zone's final amended response to Interrogatories, it named—for the first time—Ms. Hare as the sole decisionmaker. *Id.* ¶¶ 252–53.

[53] Appx. 266.

[54] *Id.*

[55] Appx. 139.

[56] *Id.*

[57] Appx. 325.

[58] Appx. 323–24.

[59] Appx. 139.

[60] Appx. 268.

[61] *Id.*

[62] Appx. 269.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] Appx. 270.

[71] Appx. 269.

[72] Appx. 265.

[73] *Id.*

[74] *Id.*

[75] Appx. 140, 153.

[76] Appx. 144.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] Appx. 145.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] Appx. 24.

[85] ECF Doc. No. 63, ¶ 51.

[86] Appx. 190.

[87] Appx. 190, 192.

[88] Appx. 192.

[89] ECF Doc. No. 63, ¶ 54.

[90] *Id.*

[91] *Id.* ¶ 52.

[92] Appx. 168.

[93] *Id.*

[94] *Id.*

[95] ECF Doc. No. 1.

[96] ECF Doc. Nos. 13, 25.

[97] Appx. 174, 182.

[98] Appx. 27.

[99] Appx. 222.

[100] Appx. 163.

[101] Appx. 229.

[102] Appx. 187.

[103] Appx. 27.

[104] Appx. 185.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] Appx. 185, 191.

[109] Appx. 185.

[110] Appx. 28.

[111] Appx. 197.

[112] Appx. 165.

[113] *Id.*

[114] Appx. 231.

[115] Appx. 190.

[116] Appx. 221, 233.

[117] Appx. 190.

[118] ECF Doc. No. 67, ¶ 173.

[119] Appx. 185.

[120] Appx. 198, 226.

[121] ECF Doc. No. 67, ¶ 168.

[122] *Id.* ¶ 169.

[123] *Id.* ¶ 172.

[124] ECF Doc. No. 63, ¶ 67.

[125] Appx. 175, 203.

[126] 42 U.S.C. § 12101 *et seq.*

[127] 43 P. S. § 951 *et seq.*

[128] ECF Doc. No. 44.

[129] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle*, 435 F.3d at 264 (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[130] We evaluate PHRA claims under the same standard as ADA claims. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

[131] *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

[132] 42 U.S.C. § 12113(b).

[133] *Id.* § 12113(a) (emphasis added).

[134] *Id.* § 12113(b).

[135] *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (stating the ADA creates an "affirmative defense" in § 12113(a)); *but see Coleman v. Pennsylvania State Police*, 561 F. App'x 138, 145 n.10 (3d Cir. 2014) (declining to decide the issue of who the burden fall upon because the defendant proffered sufficient facts to sustain a direct threat defense); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 306 (3d Cir. 2007) (declining to decide the issue because it would not affect the holding).

[136] 29 C.F.R. § 1630.2(r).

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Doe v. Cty. of Ctr., PA*, 242 F.3d 437, 447 (3d Cir. 2001) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998)) (brackets omitted).

[141] *Id.* (quoting *Bragdon*, 524 U.S. at 652) (brackets omitted).

[142] *Coleman*, 561 F. App'x at 145 n.13 (citing *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004)).

[143] *Id.* at 141.

[144] *Id.* at 142.

[145] *Id.* at 141.

[146] *Id.* at 141–42.

[147] *Id.* at 145.

[148] *Id.* at 145 n.13.

[149] *Id.*

[150] *Haas v. Wyoming Valley Health Care Sys.*, 553 F. Supp. 2d 390, 393, 397 (M.D. Pa. 2008).

[151] *Id.* at 399–400.

[152] *Id.* at 399.

[153] *Id.* at 400–01.

[154] *Id.* at 392.

[155] *Id.* at 402.

[156] *Id.* at 401.

[157] *Id.*

[158] Appx. 126.

[159] Appx. 82.

[160] Appx. 126.

[161] *Coleman*, 561 F. App'x at 145 n.13.

[162] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[163] *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 68 (3d Cir. 1996).

[164] *Id.* at 66.

[165] *Id.* (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995)).

[166] *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

[167] ECF Doc. No. 60, at p. 13.

[168] *Id.*

[169] Appx. 185, 191.

[170] Appx. 165.

[171] Appx. 197.

[172] *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

[173] 42 U.S.C. § 12113(a).

[174] ECF Doc. No. 60, at p. 14 (arguing summary judgment should be granted as to Dr. Engle's claims regarding the non-renewal of her contract because it discovered Dr. Engle retained confidential patient information).

[175] *Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1073 n.1 (3d Cir. 1995).

[176] *Id* (quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 (1995)).